

**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

---

*The Jacob K. Javits Federal Building*
*26 Federal Plaza, 37th Floor*
*New York, New York 10278*

October 8, 2024

**BY ECF**
The Honorable Gregory H. Woods
United States District Judge
Southern District of New York
500 Pearl Street
New York, New York 10007

      Re:    *United States v. Shamar Dudley*, 23 Cr. 7 (GHW)

Dear Judge Woods:

      The Government respectfully submits this letter in advance of the October 31, 2024 sentencing for defendant Shamar Dudley and in response to the defense sentencing submission, filed on October 1, 2024.

      The defendant was charged along with two co-defendants, Nashawn Wells and Alex Stroman, for orchestrating a brazen gunpoint robbery of a Manhattan boutique clothing store. Almost two years ago, on the afternoon of October 28, 2022, the defendant, Wells, Stroman, and two other co-conspirators traveled from Brooklyn to the Lower East Side to rob the store. As Stroman waited in the car outside the store, the defendant, Wells, and two others entered the clothing store, pulled dozens of designer jeans and other items off the racks and stuffed them into garbage bags, and forced terrified employees and shoppers to the back of the store at gunpoint. The co-conspirators grabbed over $50,000 of clothing before fleeing into the getaway car. The New York City Police Department ("NYPD") canvassed the surrounding area to try and locate the robbers, but it was too late. The defendant and his co-conspirators had already fled back to Brooklyn, where they subsequently brought the stolen clothing up to Stroman's apartment and divided it up for re-sale.

      The defendant pleaded guilty to one count of conspiracy to commit Hobbs Act robbery and one count of Hobbs Act robbery, without a plea agreement. As set forth in the Presentence Investigation Report ("PSR") prepared by the U.S. Probation Office ("Probation"), Probation calculates the applicable sentencing range under the U.S. Sentencing Guidelines ("U.S.S.G" or "Guidelines") on Counts One and Two as 46 to 57 months' imprisonment. This Guidelines range appropriately reflects the defendant's knowing, active participation in serious crimes that endangered members of the community, which the defendant committed for no discernable purpose other than personal greed. The Government respectfully submits that a sentence of imprisonment at the bottom of the applicable Guidelines range is necessary and appropriate in this case.

I.      **Offense Conduct and Procedural History**

In the afternoon of October 28, 2022, the defendant and four co-conspirators traveled in a silver Chevrolet Impala from Brooklyn to the Lower East Side to rob a boutique clothing store. As Stroman waited in the getaway car, the defendant, Wells, and two co-conspirators entered the store at approximately 5:55 p.m. (PSR ¶ 14). The defendant and his co-conspirators wore masks and hooded clothing or hats to conceal their identities. (PSR ¶ 13). At least one of the co-conspirators was armed with a black firearm. (PSR ¶ 18).

Surveillance video footage from the store, which is attached as Exhibit A, shows the co-conspirators pretending to browse through items of clothing, among store employees and other customers who were also in the store. (PSR ¶ 17; Ex. A (surveillance video footage)). After Wells took up a post at the front of the store, the defendant—who was wearing a gray hooded sweatshirt and gray sweatpants—suddenly pulled out a black garbage bag and began pulling articles of clothing from the clothing racks and stuffing them into the garbage bag as customers and store employees exclaimed in alarm. (PSR ¶ 16; Ex. A (surveillance video footage)). Meanwhile, two other co-conspirators—at least one of whom brandished a firearm—forced customers and employees to the back of the store near the cash register, ordering everybody to look down and get down. (PSR ¶ 17; Ex. A). The two co-conspirators also grabbed clothing from clothing racks before fleeing from the store with the defendant and Wells. (PSR ¶ 18).

After the defendant and his co-conspirators fled from the store, they ran up the street to the getaway car, while one of the store employees gave chase. (PSR ¶ 19). The defendant and his co-conspirators made their way back to Brooklyn that same evening—now with approximately $52,300 in stolen designer jeans and other designer clothing. (PSR ¶¶ 13, 20). In the days following the robbery, the defendant attempted to sell some of the stolen jeans, and he also kept one of the designer sweatshirts that he stole. (PSR ¶ 22).

On November 14, 2022, the defendant, Wells, and Stroman were charged in a three-count Complaint with conspiracy to commit Hobbs Act robbery, in violation of 18 U.S.C. § 1951; Hobbs Act robbery, in violation of 18 U.S.C. §§ 1951 and 2; and brandishing a firearm during and in relation to a crime of violence in violation of 18 U.S.C. §§ 924(c)(1)(A)(i), 924(c)(1)(A)(ii), and 2. On December 7, 2022, the defendant was arrested. That same day, a black firearm was recovered from the defendant's apartment following a search. (PSR ¶ 23).

On January 4, 2023, a grand jury sitting in this District returned Indictment No. 23 Cr. 7 (GHW), charging the defendant, Wells, and Stroman with conspiracy to commit Hobbs Act robbery, in violation of 18 U.S.C. § 1951, and Hobbs Act robbery, in violation of 18 U.S.C. §§ 1951 and 2.

II.      **Defendant's Plea and Applicable Guidelines Range**

On October 25, 2023, the defendant pleaded guilty without the benefit of a plea agreement to both counts charged in the Indictment—namely, conspiracy to commit Hobbs Act robbery and Hobbs Act robbery.

Prior to the plea, the Government provided the defendant with a *Pimentel* letter, dated September 14, 2023, that calculated a total offense level of 23 based on the following calculations: (1) a base offense level of 20 pursuant to U.S.S.G. §§ 2B3.1(a) and 2X1.1(a); (2) a 5-level increase pursuant to U.S.S.G. § 2B3.1(b)(2)(C) because a firearm was brandished or possessed; (3) a 1-level increase pursuant to U.S.S.G. § 2B3.1(b)(7)(B) because the loss was more than $20,000 but not more than $95,000; and (4) a 3-level decrease for acceptance of responsibility under U.S.S.G. §§ 3E1.1(a) and (b). The Government calculated a Criminal History Category of I, resulting in a Guidelines range of 46 to 57 months' imprisonment (the "Guidelines Range"), and a fine amount of $20,000 to $200,000.

Probation calculated the same offense level of 23 (PSR ¶¶ 32-44), Criminal History Category of I (PSR ¶¶ 45-51),[1] and resulting Guidelines Range of 46 to 57 months' imprisonment (PSR ¶ 85). Probation recommended a sentence of 36 months' imprisonment. (PSR at 26). The defendant's sentencing memorandum requests a sentence of 24 months' imprisonment. (Def. Br. at 3).

### III. Defendant's Objection to Five-Level Enhancement for the Brandishing of a Firearm

The defendant objects to the inclusion of a five-level enhancement under U.S.S.G. § 2B3.1(b)(2)(C) based on the brandishing or possession of a firearm during the robbery, asserting that "there is no proof that the dangerous weapon brandished during the robbery was an operable firearm" or that "the instrument was discharged, operable, or loaded." (Def. Br. 5; *see id.* 3-6 (arguing that a three-level enhancement under U.S.S.G. § 2B3.1(b)(2)(E) should apply instead based on the brandishing of a dangerous weapon)). The defendant is wrong, and the Court should—as it already did for Wells and Stroman, neither of whom ultimately contested the application of U.S.S.G. § 2B3.1(b)(2)(C)—adopt Probation's factual findings that a firearm was brandished or possessed and impose the five-level enhancement under U.S.S.G. § 2B3.1(b)(2)(C). (PSR ¶ 35).

When a defendant contests the Guidelines range found in the PSR, the Court may hold a hearing to resolve disputes over the applicable Guidelines range. However, the Court is not required to hold a hearing if the record permits the Court to make sufficient factual findings to support the Guidelines range. *See United States v. Phillips*, 431 F.3d 86, 93 (2d Cir. 2005) ("The district court is not required, by either the Due Process Clause or the federal Sentencing Guidelines, to hold a full-blown evidentiary hearing in resolving sentencing disputes. All that is required is that the court afford the defendant some opportunity to rebut the Government's allegations."

---

[1] The PSR, which was amended on February 16, 2024, lists no pending charges. (*See* PSR ¶ 50). However, on May 29, 2024, the Kings County District Attorney's Office unsealed Indictment No. 73017-2024 charging the defendant and fourteen other defendants in eighty-five counts. The defendant is charged in Counts 1-30 with (i) second-degree murder; (ii) second degree conspiracy to commit second-degree murder; (iii) fourth-degree conspiracy to commit second-degree criminal possession of a weapon; (iv) two counts of second-degree attempted murder; (v) first-degree attempted assault; (vi) fourteen counts of second-degree criminal possession of a weapon; (vii) three counts of first-degree reckless endangerment; (viii) two counts of first-degree gang assault; (ix) first-degree assault; and (x) four counts of second-degree assault.

(citation omitted)). A district court "satisfies its obligations to make the requisite specific factual findings when it explicitly adopts the factual findings set forth in the presentence report." *United States v. Molina*, 356 F.3d 269, 275-76 (2d Cir. 2004). In making factual findings regarding the applicable Guidelines range, "any information may be considered, so long as it has sufficient indicia of reliability to support its probable accuracy." *United States v. Martinez*, 413 F.3d 239, 242 (2d Cir. 2005) (citation omitted). A district court's "factual findings at sentencing need be supported only by a preponderance of the evidence." *United States v. Norman*, 776 F.3d 67, 76 (2d Cir. 2015).

Here, there is more than sufficient evidence in the record to find that a firearm was brandished or possessed during the robbery. *First*, victims inside the store informed responding NYPD officers on bodyworn camera footage that they saw the co-conspirators brandishing a black pistol at them and saying, in substance "look down, get the fuck down." *Second*, surveillance video footage from the store shows one of the co-conspirators displaying an object consistent with a black pistol. (PSR ¶ 18; Ex. A). *Third*, when the defendant's apartment was searched on December 7, 2022 following his arrest, approximately a month and a half after the robbery, law enforcement recovered a loaded, black pistol from the defendant's room.[2] Photographs of the pistol and magazine seized from the defendant's room are below:

 

---

[2] The defendant asserts that he did not know about the firearm because he did not stay in the apartment most days and nights, and that the firearm could have belonged to his mother or been brought by someone else who had access to his apartment. (Def. Br. 3-4). These arguments strain credulity and should be rejected for substantially the same reasons as those the Government provided to the Probation Office. (PSR ¶¶ 22-23). To start, the firearm was recovered on the floor inside a closet in the defendant's room next to personal effects, including a pair of Jordan sneakers and cash. Next, the defendant's claims that he did not stay in the apartment "most days and nights" is at odds with his admissions to the Probation Office that he "resided in the apartment alone." (PSR ¶ 56). Finally, the Court should not credit the defendant's self-serving denials to law enforcement that he knew about the firearm—indeed, in that same recorded interview, the defendant falsely denied knowing Stroman, with whom the defendant communicated multiple times.

*Finally*, when Stroman's apartment was searched on December 7, 2022 following his arrest, law enforcement recovered another loaded, black pistol from Stroman's room. A photograph of the pistol and magazine seized from Stroman's room is below:



The defendant does not dispute these facts—and so a hearing is not required. Instead, the defendant, in essence, argues that this evidence does not establish that the firearm brandished during the robbery was, in fact, an operable, loaded firearm as opposed to a toy or replica. (Def. Br. at 3-6). But such "negative evidence" is not required, and the Government is not required to "disprove [the] theoretical possibility" that a firearm seen by eyewitnesses (as here) "may have been a sophisticated toy or other facsimile," even in the context of proving a § 924(c) charge to a jury under the stricter beyond-a-reasonable-doubt standard than is applicable here. *United States v. Jones*, 16 F.3d 487, 491 (2d Cir. 1994). Indeed, eyewitness testimony alone "may be sufficient for the government to meet its burden of proof [that a defendant had a firearm] so long as it provides a rational basis for the [fact-finder] to find that the object observed by eyewitnesses was, in fact, a firearm." *United States v. Johnson*, 378 F.3d 230, 242 (2d Cir. 2004) (quoting *Jones*, 16 F.3d at 490) (alteration in original) (affirming sentencing court's rejection of defense argument that "the evidence in the record established, at most, that [the defendant] brandished or possessed only a dangerous weapon (as opposed to a firearm)" and crediting the testimony of an eyewitness who saw only 2-3 inches of the handle of a firearm in the defendant's pocket).

In sentencing the defendant's other co-defendants, Wells and Stroman, this Court adopted Probation's factual findings that a firearm was brandished or possessed, and applied a five-level enhancement for the brandishing or possession of a firearm during the exact same robbery of which the defendant now stands convicted. In light of the undisputed facts, the Court should do the same here.

## IV. Discussion

### A. Applicable Law

Although *United States v. Booker* held that the Guidelines are no longer mandatory, it also held that they remain in place and that district courts must "consult" the Guidelines and "take them into account" when sentencing. 543 U.S. 220, 264 (2005). A "district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range"—that range "should be the starting point and the initial benchmark." *Gall v. United States*, 552 U.S. 38, 49 (2007).

After making the initial Guidelines calculation, a sentencing judge must then consider the factors outlined in Title 18, United States Code, Section 3553(a), which provides that a sentencing "court shall impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2) of this subsection," and sets forth seven specific considerations:

> (1) the nature and circumstances of the offense and the history and characteristics of the defendant;
>
> (2) the need for the sentence imposed—
>
>> (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
>>
>> (B) to afford adequate deterrence to criminal conduct;
>>
>> (C) to protect the public from further crimes of the defendant; and
>>
>> (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;
>
> (3) the kinds of sentences available;
>
> (4) the kinds of sentence and the sentencing range established [in the Guidelines];
>
> (5) any pertinent policy statement [issued by the Sentencing Commission];
>
> (6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and
>
> (7) the need to provide restitution to any victims of the offense.

18 U.S.C. § 3553(a).

While a district court may not presume that an appropriate sentence lies within the

Guidelines range, "the fact that § 3553(a) explicitly directs sentencing courts to consider the Guidelines supports the premise that district courts must begin their analysis with the Guidelines and remain cognizant of them throughout the sentencing process." *Gall*, 552 U.S. at 50 n.6.  To the extent a district court varies from a Guidelines sentence, "[it] must consider the extent of the deviation and ensure that the justification is sufficiently compelling to support the degree of the variance." *Id.* at 50.  The Second Circuit has recognized that "[i]n the overwhelming majority of cases, a Guidelines sentence will fall comfortably within the broad range of sentences that would be reasonable in the particular circumstances." *United States v. Fernandez*, 443 F.3d 19, 27 (2d Cir. 2006); *see also Kimbrough v. United States*, 552 U.S. 85, 108-09 (2007) ("We have accordingly recognized that, in the ordinary case, the Commission's recommendation of a sentencing range will reflect a rough approximation of sentences that might achieve § 3553(a)'s objectives." (quotations omitted)).

### B.  The Court Should Impose a Sentence at the Bottom of the Guidelines Range

The Government respectfully submits that a sentence at the bottom of the Guidelines Range is sufficient, but not greater than necessary, in view of the statutory sentencing factors set forth in 18 U.S.C. § 3553(a).  In this case, the most salient factors are the seriousness of the offense, the need to provide just punishment for the offense, the need to promote respect for the law, the need for specific deterrence, and the need to protect the public from further crimes of the defendant.

***First***, the defendant's active participation in an armed robbery with other individuals is undoubtedly serious.  Judges in this District have observed that armed bank robbery, which is governed by the same Guidelines provision as armed Hobbs Act robbery, is "one of the more serious federal crimes," the seriousness of which "is reflected by the Guidelines which sets a base offense level of 20."  *See United States v. Mendola*, 807 F. Supp. 1063, 1065 (S.D.N.Y. 1992) (citing U.S.S.G. § 2B3.1).  Courts deciding sentence reduction motions have likewise recognized the seriousness of armed robberies in finding that the same statutory factors that this Court must consider weighs against release.  *See, e.g.*, *United States v. Kornegay*, 13 Cr. 428 (PAE), 2023 WL 2754264, at *2 (S.D.N.Y. Apr. 3, 2023) (describing robberies of "nine mobile phone stores that were terrifying to employees and customers and posed grave threats to public safety" as "exceptionally serious"); *United States v. Clarke*, 16 Cr. 781 (RJS), 2021 WL 1948492, at *3 (S.D.N.Y. May 14, 2021) (describing string of gunpoint robberies as "serious").  The inherent risk of physical harm to victims is readily apparent.  *Shabazz v. United States*, 912 F.3d 73, 77 (2d Cir. 2019) ("Robbery is deemed a very serious crime, a felony in every jurisdiction, because it presents the real danger of immediate serious physical harm to the victim." (citing E. Podgor, P. Henning, and N. Cohen, Mastering Criminal Law, at 215 (2d ed. 2015)) (emphasis removed)).  And this Court, in sentencing co-defendant Nashawn Wells, described the robbery as a "very serious" crime.  Tr. at 21-22, *United States v. Wells*, 23 Cr. 7 (GHW) (S.D.N.Y.), Dkt. 106 ("Wells Tr.").

Here, the defendant and his co-conspirators committed an armed robbery in broad daylight on a busy street in the Lower East Side with numerous bystanders in the vicinity.  As is apparent from the surveillance video footage, the clothing store itself is a small, enclosed space, and at least several employees and customers were present when the defendant's co-conspirators entered the store, wearing masks, hoods and baseball caps, and carrying at least one firearm.  The risk of serious physical harm or death to store employees and customers—multiplied by the number of

robbers and the presence of a brandished firearm—is immediately apparent. So, too, was the fear and panic that store employees and customers felt—some managed to barricade themselves in dressing rooms, others attempted to exit through the front door but were stopped by the robbers, and still others tried to get into locked dressing rooms before being herded to the back of the store at gunpoint. As this Court aptly observed, "[b]eing threatened at gunpoint is . . . for most a terrorizing, scarring experience." Wells Tr. at 22; *accord id.* at 21-22 (describing "the fear, the terror that [the robbers] must have placed in the hearts of the innocent victims of the offense, the people working in the store, and the customers who were just there to go about their daily lives interrupted by a theft involving a firearm"). A sentence within the Guidelines Range would be commensurate with the gravity of participating in a gunpoint robbery that endangered the safety of innocent members of the community, causing trauma that undoubtedly lasted well beyond the just the day of the robbery.

**Second**, the need for deterrence and to protect the public from the defendant's crimes counsels in favor of a Guidelines sentence. The defendant's crime was planned and calculated, not a spur-of-the-moment decision or a momentary lapse in judgment. It also appears to have been motivated by greed. The defendant and his co-conspirators stole approximately $52,300 worth of clothing—including 35 pairs of Amiri jeans, worth over $1,300 each—to turn a profit by re-selling them to others. After the robbery, the defendant and his co-conspirators brought the stolen clothing back to the defendant's apartment, where they divided the loot. The defendant's own Instagram messages in the days following the robbery make clear what he planned to do with the stolen clothing: sell them to others. (PSR ¶ 22).

The need for a serious sentence to deter the defendant and protect the public is entirely consistent with the U.S. Sentencing Commission's empirical data regarding recidivism rates for those convicted of robbery. Specifically, the Sentencing Commission's recidivism research found not only that "federal offenders who were sentenced for violent offenses recidivated at a substantially higher rate than offenders sentenced for non-violent offenses," but also that robbery offenders "were also more likely to be rearrested and rearrested for more serious offenses compared to all other violent offenders." United States Sentencing Commission, Federal Robbery Prevalence, Trends, and Factors in Sentencing (last accessed October 8, 2024), https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2022/20220818_Robbery.pdf.

The defendant's history and characteristics also point to an acute need for deterrence. The defendant already has a prior juvenile adjudication from March 2021 for second-degree criminal possession of a weapon. (PSR ¶ 45). He received 18 months' probation for that incident—in other words, he committed the armed robbery at issue in this case just one month after finishing his probationary term. The defendant's conduct while on pre-trial release—which includes 13 positive marijuana tests and 1 positive opioid test in 9 months of pre-trial supervision before his remand, as well as a failure to "consistently engage in treatment services and report as directed" (PSR ¶ 75)—is also troubling. Specifically, the defendant claimed that he was "high" on marijuana or Percocet when the instant offense occurred (PSR ¶ 74)—ostensibly, to suggest that being under the influence impaired his judgment and contributed to his criminal conduct (*see* Def. Br., Ex. A, at 3 (defense mitigation specialist arguing that "Shamar's behavior under the influence contributed to his legal problems and his inability to make rational decisions")). But if that is so, the

defendant's persistent failure to stop using narcotics even while on court supervision—and indeed, during almost the entirety of his pre-trial release—portends a likely return to criminal conduct that must be deterred.[3]

### V.     Forfeiture and Restitution

As noted above, the defendant personally participated in a gunpoint robbery that resulted in approximately $52,300 in losses to the victim store. Accordingly, the Government will seek forfeiture in the amount of $52,300 and restitution in the amount of $52,300, and the Government will submit to the Court proposed forfeiture and restitution orders in advance of sentencing consistent with those entered with respect to co-defendants Nashawn Wells and Alex Stroman.

### VI.    Conclusion

For the reasons set forth above, the Court should impose a sentence at the bottom of the applicable Guidelines Range.

Respectfully submitted,

DAMIAN WILLIAMS
United States Attorney

By: _____
Jerry J. Fang
Assistant United States Attorney
(212) 637-2584

Cc: Jason Foy, Esq. and Eric Sarraga, Esq. (by ECF and email)

---

[3] Notably, the defendant's mitigation submission also notes that his narcotics addiction was exacerbated "during his musical career as a drill rapper," which often feature lyrics that are "often graphic, violence, and glorify antisocial behavior," and "frequently reference gang culture, drug use, and firearms." (Def. Br., Ex. A, at 2; *id.* at 13 (noting that "lean and Percocet" are "heavily used in the drill music industry")). To be clear, the defendant's drill rap career—during which he used the stage name "Mar Binbloxks"—appears to have continued even while he was on pre-trial release. (*See, e.g.*, "Mar binbloxks – NO TDG (MUSIC VIDEO) #EveryFshot #593 #TgGoKrazy(prod by shomii beats x Glo banks)," https://www.youtube.com/watch?v=EhFJPCXVrao (uploaded on Jan. 1, 2023); "Mar BinBloxks X Briscoe Bands – REAL SH!T," https://www.youtube.com/watch?v=YFw1Y8hWdTs (uploaded on October 9, 2023)). While the defendant's choice to continue pursuing a career as a drill rapper is obviously his own, his own mitigation specialist acknowledges a causal link between drill rap, narcotics use, and the defendant's participation in criminal conduct, which is entirely proper for this Court to consider in assessing the defendant's risk of recidivism.